IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:14-CV-26-BR

| | |
|---|---|
| RICHARD RAMSEY,  )<br>      Plaintiff,  )<br>  )<br>v.  )<br>  )<br>BIMBO FOODS BAKERIES  )<br>DISTRIBUTION, INC. formally known as  )<br>GEORGE WESTON BAKERIES  )<br>DISTRIBUTIONS, INC.,  )<br>      Defendant.  )<br>  ) | ORDER |

This matter is before the court on defendant's ("defendant" or "BFBD") motion to dismiss plaintiff's complaint and plaintiff's motion for a preliminary injunction and request for joint hearing. (DE ## 12, 14, 16.) The motions have been fully briefed and are ripe for disposition.

## I. BACKGROUND

In 2008, for $130,000, plaintiff, as an "independent operator," purchased a distribution route which granted him exclusive rights to purchase bakery products from defendant and sell those products to grocery store chains and independent grocers in a designated area. (Compl., DE # 1-1, ¶¶ 6, 8, 9.) At the same time, he entered into a Distribution Agreement with defendant and was "to be paid on a percentage of sales or a margin on the sale of product." (Id. ¶ 8 & Ex. 1.)

In June 2013, defendant informed plaintiff and other local independent operators that it was reducing the margins to be paid to them. (Id. ¶ 10.) Plaintiff and most of the other independent operators "united in an effort to fight the Defendant's effort to unilaterally reduce margins." (Id. ¶ 12.) A committee of six independent operators was formed to communicate and

negotiate with defendant about the reduced margins. (Id.) Plaintiff was one of the committee members and took an active role in the committee, being "outspoken with regard to the sentiment of the 30 independent operators relative to the payment of commissions and/or reduction of margins received for services." (Id. ¶¶ 12, 18.) Various forms of communication between the committee, its counsel, representatives of defendant, and defense counsel occurred. (See id. ¶¶ 14-16.) According to plaintiff, defendant refused to negotiate. (Id. ¶ 15.)

In the meantime, plaintiff continued to operate his distribution route. (Id. ¶ 20.) On 6 December 2013, defendant, through its sales representative Brant Vickers, issued to plaintiff a "Notice of Breach of Distribution Agreement." (Id. ¶ 25 & Ex. 5.) That Notice states,

> Dear Mr. Ramsey:
>
> On December 4, 2013, your customer, Harris Teeter #257, reported to us that you are no longer permitted to service its store with the products of Bimbo Foods Bakeries Distribution Inc. ("BFBD") due to your continuing and continuous failure to provide proper and satisfactory service, including out of stock conditions on core items and promotional products. Accordingly, you are in breach of your Distribution Agreement with BFBD.
>
> You have three days to cure the contract violation. If you do not, we will take appropriate action under the Distribution Agreement.

(Id., Ex. 5.) On 11 December 2013, Vickers issued to plaintiff a "Notice of Termination of Distribution Agreement." (Id. ¶ 25 & Ex. 6.) That document refers to the 6 December 2013 notification of violation of the Distribution Agreement and states that plaintiff failed to cure the breach and that, accordingly, the Distribution Agreement is terminated effectively immediately. (Id., Ex. 6.)

According to plaintiff, he and the Harris Teeter manager referenced in the Notices had "personality problems resulting in the manager of the store deciding not to let the Plaintiff enter

2

the business." (Id. ¶ 25.) "The Plaintiff did everything within his power to attempt to placate the Harris Teeter store manager but without any success whatsoever." (Id. ¶ 26.) Plaintiff and another independent operator agreed to exchange stores, yet apparently the Harris Teeter store manager rejected this option. (See id. ¶ 27.) Then, plaintiff negotiated with Vickers to exchange his (plaintiff's) distribution route with another independent operator. (Id. ¶ 28.) The Harris Teeter store manager would not agree to this arrangement either. (Id.) This event prompted defendant's issuance of the Notices of Breach and Termination to plaintiff. (Id.) Plaintiff requested a hearing with management to produce evidence of his agreement reached with the other independent operator to cure the problem, but his request was refused and plaintiff was informed that he could not return to defendant's premises. (Id. ¶ 30.)

Since defendant's termination of the Distribution Agreement, defendant has been operating the distribution route in plaintiff's name at a loss. (Id. ¶¶ 37-38.) Plaintiff claims that "[t]he allegations set forth in the Notice of Breach and Notice of Termination do not allege a valid reason for termination under the true facts" and that "[t]he attempt to terminate the Plaintiff's independent operator agreement is for the purpose of punishing the Plaintiff for taking an active role in attempting to negotiate a return to the margins paid prior to the actions taken by the Defendant in reducing margins" and to profit from the resale of the distribution route. (Id. ¶¶ 32, 36; see also Resp., DE # 17, at 6.)

On 21 January 2014, plaintiff filed the instant complaint in state court, asserting claims for breach of contract, fraud, and unfair and deceptive trade practices under Chapter 75 of the North Carolina General Statutes. Plaintiff seeks injunctive and compensatory relief, including punitive damages. On the same day plaintiff filed the case, defendant removed it to this court.

3

On 12 February 2014, defendant filed the motion to dismiss plaintiff's complaint. On 24 February 2014, plaintiff filed the motion for preliminary injunction along with the request for joint hearing on his motion for preliminary injunction in this case and the motion for preliminary injunction in <u>Martin v. Bimbo Foods Bakeries Distribution, Inc.</u>, No. 5:14-CV-17-BR (E.D.N.C.). On 3 March 2014, plaintiff filed his response in opposition to defendant's motion to dismiss, to which defendant filed its reply on 20 March 2014. Also, on 20 March 2014, defendant filed its documents in opposition to plaintiff's motion for preliminary injunction and in opposition to plaintiff's request for joint hearing. Plaintiff did not file any reply.

## II. **DISCUSSION**

A.   Motion to Dismiss

Defendant moves to dismiss all of plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

> To survive a motion to dismiss pursuant to Rule 12(b)(6), [the plaintiff's] "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [its] claims across the line from conceivable to plausible."
>> The plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." It requires the plaintiff to articulate facts, when accepted as true, that "show" that the plaintiff has stated a claim entitling him to relief, i.e., the "plausibility of 'entitlement to relief.'"
>> To emphasize the Federal Rules' requirements for stating claims that are warranted and therefore form a plausible basis for relief, the Supreme Court has held that a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." To discount such unadorned conclusory allegations, "a court considering a motion to dismiss can choose to begin by

4

> identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." This approach recognizes that "naked assertions" of wrongdoing necessitate some "factual enhancement" within the complaint to cross "the line between possibility and plausibility of entitlement to relief."
>
> At bottom, determining whether a complaint states on its face a plausible claim for relief and therefore can survive a Rule 12(b)(6) motion will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'— 'that the pleader is entitled to relief,'" as required by Rule 8.

Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 543 (4th Cir. 2013) (most alterations in original) (citations omitted).

In making this determination, the court does not normally consider matters outside of the complaint. See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . ., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). The court may, however, consider those documents attached to the complaint itself "so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (citation omitted).

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract."[1] Ahmadi v. Triangle

---

[1] Although the Distribution Agreement provides that its "validity, interpretation and performance . . . shall be controlled by and construed in accordance with the laws of the Commonwealth of Pennsylvania," (Compl., Ex. 1, DE # 1-1), plaintiff relies on North Carolina law to support his breach of contract claim, (Resp., DE # 17, at 5), and defendant does not contend any other state's law applies, (see Reply, DE # 18, at 4 (citing Atlantic v. E. Carolina Ry. Co v. S. Outdoor Adver., Inc. 501 S.E.2d 87 (N.C. Ct. App. 1998)).

5

Rent A Car, Inc., 691 S.E.2d 101, 103 (N.C. Ct. App. 2010) (citation and quotation omitted). "In order for a breach of contract to be actionable it must be a material breach, one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." Long v. Long, 588 S.E.2d 1, 4 (N.C. Ct. App. 2003) (citation and quotation omitted). Defendant contends that plaintiff has not sufficiently alleged that it improperly terminated the Distribution Agreement.

According to the relevant terms of the Agreement, defendant may terminate the Agreement when the distributor (also known as the independent operator) does not cure a breach. Specifically, the Distribution Agreement provides in Article 8:

> §8.3 CURABLE BREACH: In the event of breach by DISTRIBUTOR other than under §8.2,[i.e., a "non-curable" breach,] GWBD[2] shall give DISTRIBUTOR three (3) business days written notice within which DISTRIBUTOR may cure the breach. If DISTRIBUTOR fails to cure such breach within said three (3) day period, GWBD may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure
> . . . .

(Compl., Ex. 1, DE # 1-1.) Under the Agreement, plaintiff is obligated to "develop and maximize sales of Products to Outlets[3] within [his] Sales Area by maintaining an adequate and fresh supply of Products in all Outlets" and by "providing service on a basis consistent with good industry practice to all Outlets requesting service in the Sales Area." (Id. §4.1.) Failure to fulfill these obligations "shall be considered a breach" and "entitle [defendant] to terminate [the Distribution] Agreement as more specifically set forth in Article 8 . . . ." (Compl., Ex. 1, DE #

---

[2]Defendant was previously known as George Weston Bakeries Distribution, Inc. or "GWBD." (Compl., DE # 1-1, ¶ 2.)

[3]Outlets are "all retail stores which purchase Products by store door delivery." (Compl., Ex.1, Sch. B, DE # 1-1.) No one suggests that a Harris Teeter grocery store does not meet this definition.

6

1-1, §4.4.)

Defendant argues that because plaintiff was banned from entering the subject Harris Teeter store, he was unable to service all stores on his distribution route and thus was in breach of the Distribution Agreement, and its termination was proper. (Mem., DE # 13, at 4-5.) Plaintiff does not deny that he was prohibited from entering the store. Rather, he claims that the Distribution Agreement does not state that it could be terminated if the distributor has a disagreement with a store manager, and he argues that any breach by him (which he does not concede) was not material. (Resp., DE # 17, at 5-6; see also Compl., DE # 1-1, ¶¶ 25-26 ("The fact that the Plaintiff had a problem with one of his customers was not a material matter that needed to be considered by the Defendant. . . . The Defendant allowed an irate and disgruntled manager of Harris Teeter #257 to dictate that the Plaintiff be terminated by the Defendant.").) Therefore, he alleges, defendant breached the Agreement by terminating it without just cause. (Compl., DE # 1-1, ¶¶ 25, 55(1); Resp., DE # 17, at 6.)

Plaintiff is correct that the Distribution Agreement does not expressly provide that defendant may terminate it if the distributor and a store manager have some sort of disagreement. However, as previously recognized, defendant does have the right to terminate if the distributor cannot maximize sales to retail stores by maintaining the product supply. Whether the inability to service one retail store constitutes a material breach of the Distribution Agreement cannot be determined now. It is enough that plaintiff alleges defendant unjustifiably terminated the Agreement as a pretext to punish plaintiff for his role on the committee negotiating about the reduced margins and to profit financially from the resale of the distribution route. Therefore, the court will not dismiss plaintiff's breach of contract claim.

7

Turning to his next claim, plaintiff alleges:

> The Defendant committed fraud by intentionally and fraudulently making false and untrue allegations in the Notice of Termination for the purpose of attempting to create some sort of claim that would justify the termination of Plaintiff's independent operator's contract. The Defendant acted with fraudulent intent and for the purpose of fraudulently and unlawfully attempting to terminate the Plaintiff's independent operator's agreement.

(Compl., DE # 1-1, ¶ 59.) Hence, plaintiff's fraud claim is based on his contention that defendant's stated reason for terminating the Distribution Agreement was pretextual. (See Resp., DE # 17, at 7.)

"The essential elements of actionable fraud are: '(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" Cobb v. Pa. Life Ins. Co., 715 S.E.2d 541, 549 (N.C. Ct. App. 2011) (citation omitted) (alteration in original). The court agrees with defendant that plaintiff has not adequately pled such a claim.

First, one cannot transform a breach of contract claim into a fraud claim based solely on the failure to perform in accordance with the contract's terms. See Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998) ("But it is plain that '[t]he mere failure to carry out a promise in contract . . . does not support a tort action for fraud.'" (quoting Strum v. Exxon Co., 15 F.3d 327, 331 (4th Cir. 1994) (citing Hoyle v. Bagby, 117 S.E.2d 760, 762 (N.C. 1961); In re Baby Boy Shamp, 347 S.E.2d 848, 853 (N.C. Ct. App. 1986))). Second, plaintiff challenged the termination from the outset. (See Compl., DE # 1-1, ¶ 30 ("request[ing] a hearing with management so he could produce testimony and produce agreements that he had reached with another independent operator that would cure the problem for which the Plaintiff has lost

8

his distribution rights under his independent operator's agreement."). Thus, he was in no way deceived by defendant's purportedly false statements in the Notice of Termination. Accordingly, plaintiff has failed to state a claim for fraud.

Finally, the court considers plaintiff's claim under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 *et seq*.

> The UDTPA is meant to prevent "unfair or deceptive acts or practices in or affecting commerce." In order to state a claim under the UDTPA, a plaintiff must show "(1) defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff." Whether conduct is "unfair" or "deceptive" is a legal issue for the court to decide.
> [A] mere breach of contract claim "is not unfair or deceptive, . . . absent substantial aggravating circumstances." The North Carolina Court of Appeals has further explained,
>> Egregious or aggravating circumstances must be alleged before the provisions of the [UDTPA] may take effect. Aggravating circumstances include conduct of the breaching party that is deceptive. Finally, in determining whether a particular act or practice is deceptive, its effect on the average consumer is considered.
> Indeed, "it is unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations."

Ellis v. Louisiana-Pac. Corp., 699 F.3d 778, 787 (4th Cir. 2012) (citations omitted).

Defendant contends that plaintiff's allegations amount to nothing more than a standard breach of contract action. (Mem., DE # 15, at 9.) The court disagrees. At this stage of the proceedings, the facts of this case are sufficiently analogous to those in Johnson v. Colonial Life & Accident Ins. Co., 618 S.E.2d 867 (N.C. Ct. App. 2005). In Johnson, the plaintiff's employment as an insurance sales representative could only be terminated for cause. 618 S.E.2d

9

at 869.  The letter terminating the plaintiff's employment stated that he was being terminated for filing a fraudulent claim for benefits (which would be cause for termination under the terms of the contract).  Id.  However, the plaintiff claimed that the real reason for his termination was his employer's dissatisfaction with his assisting policyholders in filling out insurance claims.  Id.  The employer's motion for summary judgment was denied, and the case was submitted to the jury on the issues of breach of the employment contract and whether the employer had engaged in specified, aggravated circumstances associated with the breach, among other issues.  Id. at 870.  The jury found that the employer breached the contract, i.e., the termination was not for cause.  Id. at 870-71.  The North Carolina Court of Appeals found that, based on the conflicting evidence regarding the issue of whether plaintiff filed a fraudulent claim for benefits, the breach of contract claim was properly submitted to the jury.  Id.  In considering the employer's appeal of the trial court's determination that there was a violation of the UDTPA, the appellate court stated:

> [The Plaintiff] presented evidence that false accusations were deceptively made against him as a pre-text forming the basis of termination and the jury agreed.  Therefore, where the jury found that there was a breach of contract accompanied by aggravating factors, it was proper for the judge to conclude as a matter of law that a claim under N.C. Gen. Stat. § 75-1.1 had been satisfied.

Id. at 871.

In this case, plaintiff is claiming that not only did defendant terminate their agreement contrary to its terms but also defendant acted unfairly and deceptively by pretextually terminating the agreement.  Under Johnson, that pretextual termination may constitute a substantial aggravating circumstance attendant to the breach of contract.  Therefore, the court concludes that plaintiff has sufficiently alleged a UDTPA claim.

10

B.     Plaintiff's Motion for Preliminary Injunction and Request for Joint Hearing

Plaintiff requests that the court preliminarily enjoin defendant "from in any way interfering with Plaintiff['s] . . . operation of his bakery products distribution route . . . and from taking any action or invoking any timeline to force the sale of Plaintiff['s] . . . independent operator's agreement." (Mot., DE # 14, at 1.) "Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." Direx Int'l, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation marks and citations omitted) (alteration in original). "To obtain a preliminary injunction, a moving party must establish the presence of the following: (1) 'a clear showing that it will likely succeed on the merits'; (2) 'a clear showing that it is likely to be irreparably harmed absent preliminary relief'; (3) the balance of equities tips in favor of the moving party; and (4) a preliminary injunction is in the public interest." United States v. South Carolina, 720 F.3d 518, 533 (4th Cir. 2013) (citation omitted). Each of these requirements must be satisfied. The Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 347 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010).

Plaintiff seeks a preliminary injunction only in regards to his breach of contract claim. Therefore, the court considers plaintiff's likelihood of success on the merits only as to plaintiff's claim that defendant breached the Distribution Agreement.

According to plaintiff, the reason for the dispute with the Harris Teeter store manager is largely due to defendant, specifically its computerized product ordering system. (See Pl. Aff., DE # 14-1, at 1-2.) Plaintiff explains that around Thanksgiving the subject store ran out of bread

11

on one occasion, (id.), which plaintiff blames on defendant's ordering system, (see id. at 3). The issue was exacerbated by the fact that Harris Teeter officials "did a walk-through of the store, and they were upset with the store manager by virtue of the fact that the supply of products on the shelves was low or depleted." (Id.) When plaintiff was finally able to speak with the store manager directly, the store manager informed plaintiff "that the problem was bigger than [plaintiff] and him and that he would not permit [plaintiff] to deliver bakery products in the future to his store." (Id.) Thereafter, the store manager would not agree to plaintiff's proposals to have another independent operator service the store, whereupon plaintiff received the Notice of Termination of Distribution Agreement. (Id. at 2-3.)

According to plaintiff's evidence, two other independent operators had "been run out of some of the stores that they serve." (Martin Aff., DE # 14-2, at 1.) "In each of those cases, [defendant] has assisted [the independent operators] in getting back into the stores where the store manager had denied them access," with defendant "act[ing] as an intermediary in assisting the independent operator in getting back into the store." (Id.) Although plaintiff testifies that defendant's representative Vickers approved plaintiff's proposal to exchange or transfer his distribution route with that of another independent operator, (Pl. Aff., DE # 14-1, at 2-3), plaintiff characterizes defendant's conduct as a refusal "to cooperate for the reason that [defendant] wanted to terminate Plaintiff Ramsey by reason of his involvement with the other independent operators in seeking some relief as it relates to the arbitrary reduction in margins or manner of payment," (Pl. Mem., DE # 15, at 4 (citation omitted)).

Defendant lays blame for the Harris Teeter store incident entirely on plaintiff. According to defendant, for the Thanksgiving time period at issue for the subject Harris Teeter store,

12

plaintiff substantially altered the amount of product ordered from that suggested by defendant's computerized system. (Vickers Aff., DE # 22, ¶ 15.) Defendant contends that "[plaintiff's] reduction of the historically predicted sales number was the specific cause of the Harris Teeter store running out of Product on November 26, not [defendant]." (Id.) Two days after Vickers learned that plaintiff had been banned from the Harris Teeter store for failure to keep the store adequately stocked over a period of time, Vickers delivered to plaintiff the letter notifying him of breach of the Distribution Agreement and providing him with three days to cure the breach. (Id. ¶ 19.) In subsequent, separate conversations with plaintiff, Vickers agreed to both of plaintiff's proposals regarding another independent operator servicing the store. (Id. ¶¶ 20, 21.) After being made aware that the store manager would not agree to either proposal, Vickers delivered the letter to plaintiff terminating the Distribution Agreement. (Id. ¶¶ 21, 22.) Defendant maintains that because plaintiff was banned from servicing the one Harris Teeter store, he could not comply with his obligation under the Distribution Agreement to maximize product sales by maintaining adequate supply in all outlets.

Because there is a factual dispute as to whether plaintiff breached the Distribution Agreement thereby entitling defendant to terminate it, plaintiff has not clearly shown that he will likely succeed on the merits of his breach of contract claim. See Wellin v. Wellin, No. 2:13-cv-1831-DCN, 2013 WL 6175829, at *4 (D.S.C. Nov. 22, 2013) (recognizing "a number of courts have declined to issue a preliminary injunction when there are significant factual disputes" and finding the plaintiff had not clearly shown likelihood of success on the merits on breach of fiduciary duty and securities claims based on "significant factual disputes impossible to resolve" at the time); Torres Advanced Enter. Solutions LLC v. Mid-Atl. Prof'ls Inc., No. PWG-12-3679,

13

2013 WL 531215, at *3 (D. Md. Feb. 8, 2013) ("Relevant to the present case is that post-*Real Truth* courts have 'declined to issue a preliminary injunction when there are significant factual disputes' in breach of contract cases." (citation omitted)); Chattery Int'l, Inc. v. Jolida, Inc., Civil No. WDQ-10-2236, 2011 WL 1230822, at *9, 11 (D. Md. Mar. 28, 2011) (concluding that based, in part, on the existence of factual questions, plaintiff had not clearly shown likelihood of success on its trademark infringement claim).

Even if plaintiff could make such a showing, the court also concludes that plaintiff has failed to clearly show that he will likely be irreparably harmed unless a preliminary injunction issues. "Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate. Thus, when the record indicates that [plaintiff's loss] is a matter of simple mathematic calculation, a plaintiff fails to establish irreparable injury for preliminary injunction purposes." Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551-52 (4th Cir. 1994) (internal quotation marks and citations omitted) (alteration in original); see also Bethesda Softworks, LLC v. Interplay Entm't Corp., 452 F. App'x 351, 353 (4th Cir. 2011).

Plaintiff argues that his damages are incalculable based on the harm to his reputation and goodwill. (Pl. Mem., DE # 15, at 9-10.) Specifically, he points out that he has built up his route and has a stake in maintaining his customer relationships, which the persons now operating the route do not. (Id. at 9.) He questions how his damages might be calculated with any accuracy if a sale of the route (which is permitted upon termination of the Distribution Agreement) is forced. (Id. at 9-10.) While there is authority for the general proposition that loss of goodwill may satisfy the irreparable harm requirement, see Multi-Channel, 22 F.3d at 552 ("[W]hen the failure

14

to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."), a court still must look at the specific facts of each case to determine whether the harm to goodwill makes damages difficult to ascertain, see <u>MicroAire Surgical Instruments, Inc. v. Arthrex, Inc.</u>, 726 F. Supp. 2d 604, 637 (W.D. Va. 2010) ("Although the authorities upon which [the plaintiff] relies, namely the Fourth Circuit decision in *Multi–Channel*, contain broad language regarding the availability of injunctive relief when the loss of future customers or harm to goodwill renders the calculation of damages difficult, they do not hold [ ] that injunctive relief is automatic and required in such circumstances, and they proceed[ ] to analyze the specific facts of the case before determining that the loss of future customers or the harm to goodwill makes damages difficult to ascertain." (most alterations in original) (citation omitted)). Depending on the facts, goodwill can often be valued in monetary terms. Compare <u>Dexter 345 Inc. v. Cuomo</u>, 663 F.3d 59, 63 (2d Cir. 2011) (affirming the district court's denial of a preliminary injunction on the ground that the appellants had failed to make the requisite showing of irreparable harm and stating "[t]he district court correctly found that any loss of goodwill would result from the Appellants' inability to continue operating their budget hotel business as they had in the past[, and] [t]he long history of operation . . . ensures that they will be able to calculate money damages for any loss of goodwill"); <u>Spacemax Int'l LLC v. Core Health & Fitness, LLC</u>, Civil Action No. 2:13-4015-CCC-JAD, 2013 WL 5817168, at *2 (D.N.J. Oct. 28, 2013) (where the plaintiff claimed the defendant had breached the exclusive distributorship agreement in terminating it and by entering into a new agreement with another party and where the plaintiff argued it would lose market share and potentially its entire business without a preliminary injunction, finding the plaintiff had not

15

sufficiently demonstrated irreparable harm given the plaintiff's decade-long history of selling the subject equipment as "any loss in sales or harm to reputation can be given a monetary value by looking at sales records, profits, and financial analysis of what Plaintiff contends is a small, limited market"); Torres, 2013 WL 531215, at *5 (where the plaintiff argued loss of goodwill constituted irreparable harm as a result of the defendant's termination of a portion of a subcontract, taking judicial notice of the Financial Accounting Standards Board's "voluminous standard for dealing with goodwill in order to calculate its value on a balance sheet" and concluding "[t]his ability to calculate money damages from the impairment of goodwill demonstrates an adequate remedy at law"); Walter v. CPC Int'l Inc., 22 Phila. C. 240, 253-59 (Pa. Com. Pl. 1991) (dissolving preliminary injunction because the plaintiffs demonstrated that their losses could be compensated in money damages by evidence of resale value of bakery product distribution route, loss of profits, and goodwill), aff'd, 610 A.2d 73 (Pa. Super. Ct. 1992) (table), with Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co., Inc., 550 F.2d 189, 196-97 (4th Cir. 1977) (reversing denial of a preliminary injunction where the defendant manufacturer had terminated the plaintiff's furniture line dealership because the harm posed to the plaintiff's goodwill was incalculable inasmuch as the plaintiff would be unable to fill customer orders and then gain a reputation for unreliability and it would impact the plaintiff's efforts to be known as a "'full-line' furniture discounter"); Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n, Inc., No. 1:06CV191, 2006 WL 2524188, at *4 (W.D.N.C. Aug. 29, 2006) (recognizing customer confusion resulting from the defendant's changing of the signage at a resort to a completely different name as "irreparable harm in the form of losses of goodwill, reputation and future business"); Fairfield Resorts, Inc. v. Fairfield Mountains Prop.

Owners Ass'n, Inc., No. 1:06CV191, 2006 WL 1889152, at *4-5 (W.D.N.C. July 7, 2006) (finding that if the defendant property owner were not enjoined from evicting the plaintiff real estate management company, the plaintiff faced a present threat of irreparable harm in "the loss of customers, loss of good will, damage to its business reputation, and significant interference with the possession and enjoyment of certain real property").

Here, plaintiff had been operating the distribution route for five years when defendant terminated it. Based on the fact that plaintiff's distribution route was well established at the time of termination, there should be more than sufficient historical data from which to calculate monetary damages. Additionally, any goodwill plaintiff has built up in the distribution route is included in the valuation of the route, as evidenced by plaintiff's own testimony that he has created equity in the route and its value has increased from $130,000 to in excess of $140,000. (Compl., DE # 1-1, ¶¶ 8, 9.) There is a monetary value that can be placed on the loss of goodwill. Defendant has come forward with evidence that there is an active market for the sale of rights to distribute defendant's products in North Carolina, (Pokallus Decl., DE # 21, ¶ 4), and that the fair market value of any such distributorship is based on a formula of the weekly average of net product sales revenue times a multiple, (Barnes Decl., DE # 20, ¶ 16). Because plaintiff's breach of contract damages are calculable, he has not clearly shown that he is likely to be irreparably harmed absent preliminary relief. But see Williams v. Bimbo Foods Bakeries Distrib., Inc., Civil Action No. 3:10-CV-167-DCK, 2010 WL 1994847, at *5 (W.D.N.C. May 18, 2010) ("If BFBD is permitted to terminate[] Williams' Distribution Agreement and force him to sell his distribution rights, or sell them for him after ninety days, . . . Williams is likely to suffer irreparable harm. . . . [I]t would be difficult, if not impossible for Williams to articulate

17

and set forth with any specificity, the damages he would sustain were BFBD permitted to force a sale or sell the route for him. . . . If the Court were not to enter this Preliminary Injunction and the route were taken from Williams and sold, Williams would lose his livelihood."); Waldron v. George Weston Bakeries, Inc., 575 F. Supp. 2d 271, 278 (D. Me. 2008) ("[I]it is clear that Plaintiffs' absence and the operation of Plaintiffs' routes by substitutes will continue to impact the good will each of them establish through regular weekly contact with their customers. It will be very difficult, if not impossible, for the Court to determine how and if that good will would have increased sales during the period that GWBD was operating Plaintiffs' routes. Under these circumstances, a finding of irreparable harm is warranted." (citations omitted)); aff'd, 570 F.3d 5 (1st Cir. 2009).

With plaintiff failing to make the required showing of irreparable harm, the balance of equities necessarily does not tip in his favor. See Z–Man Fishing Prods., Inc. v. Renosky, 790 F. Supp. 2d 418, 434 (D.S.C. 2011) ("Here, the Court has found that Plaintiffs failed to show they will suffer irreparable harm in the absence of a preliminary injunction; therefore, the balance of equities does not favor Plaintiffs."). Finally, the court recognizes that the public interest is served by the enforcement of valid contractual obligations. Williams, 2010 WL 1994847, at *5. Nonetheless, in this case, given the factual dispute over the termination of the Distribution Agreement, that interest is furthered no matter whether the court grants or denies preliminary injunctive relief.

In sum, plaintiff has not made the requisite showing to justify entry of a preliminary injunction. Plaintiff's request for a consolidated hearing on his preliminary injunction motions in this case and a companion case (which the court has since ruled on) is moot.

18

### III. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is ALLOWED IN PART and DENIED IN PART. Plaintiff's fraud claim is DISMISSED WITH PREJUDICE. Plaintiff's breach of contract and UDTPA claims remain. Plaintiff's motion for a preliminary injunction is DENIED and his request for joint hearing is DENIED as moot.

Trial is hereby SET for 3 August 2015 in Raleigh, North Carolina.

This 10 July 2014.

_____
W. Earl Britt
Senior U.S. District Judge