IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:14-CV-26-BR

| | |
|---|---|
| RICHARD RAMSEY, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>BIMBO FOODS BAKERIES )<br>DISTRIBUTION, INC. formally known as )<br>GEORGE WESTON BAKERIES )<br>DISTRIBUTION, INC., )<br>    Defendant. )<br>) | ORDER |

This matter is before the court on defendant's ("defendant" or "BFBD") motion for summary judgment. The motion is fully briefed and ripe for disposition.

## I.    BACKGROUND

In 2008, for $130,000, plaintiff purchased a distribution route which granted him exclusive rights to purchase bakery products from defendant's predecessor, George Weston Bakeries Distribution, Inc. ("GWBD"), and sell those products to grocery store chains and independent grocers in a designated area. (Compl., DE # 1-1, ¶¶ 6, 8, 9.)[1] At the same time, he entered into a Distributorship Agreement with GWBD. (Id., Ex. 1.) As an "independent operator" under the Agreement, plaintiff's income was derived from what he characterizes as "margin," or a percentage of sales of product. (Id. ¶ 8.) Defendant characterizes it slightly differently—"spread"—"the difference . . . between the purchase price and the sales price of the product to the customer." (Vickers Decl., DE # 22, ¶ 10.) For purposes of the court's analysis the differing characterizations are not material. At bottom, plaintiff made more money the higher

---

[1] Plaintiff's complaint is verified, and therefore, it may be considered in resolving defendant's motion for summary judgment. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (citations omitted)).

the margin and the lower the price of the products he purchased from defendant. For a period of nearly five years, the margin plaintiff was paid remained the same. (Compl., DE # 1-1, ¶ 17.)

In June 2013, plaintiff's distribution route changed. Plaintiff paid $52,000 to defendant for the right to distribute Sara Lee and other products. (Ramsey Decl., DE # 41-1, ¶ 1; Vickers Decl., DE # 22, ¶ 7; Barnes Decl., DE # 20, ¶ 15.) The grocery stores on his route decreased from eight to four, (Ramsey Dep., DE # 35-1, at 4),[2] with Harris Teeter store #257 being a newly added store, (Ramsey Decl., DE # 41-1, ¶ 1).

Around the same time, defendant reduced the margins paid independent operators in the Raleigh area. (Compl., DE # 1-1, ¶¶ 10-11, 21.) Although defendant raised the prices of certain products it sold to independent operators, the prices at which the grocery stores purchased those products from the independent operators did not change,[3] resulting in decreased profits independent operators earned on those products. (See Barnes Decl., DE # 20, ¶¶ 10, 14.) In response, a committee of six independent operators, including plaintiff, was organized to resist the change in margins. (Ramsey Dep., DE # 41-2, at 5.) Some correspondence and a meeting of the committee with defendant's representatives took place. (Compl., DE # 1-1, ¶¶ 13-14.) The committee's efforts appear to have culminated with a meeting at the RDU airport between the committee and its attorney and defendant's representatives and its attorney. (See id. ¶ 15.) At that meeting, plaintiff and most of the other members of the committee were outspoken about their dissatisfaction with the change in margins. (Id. ¶ 18; Ramsey Dep., DE # 41-2, at 6.) According

---

[2] Page number citations to deposition testimony are to those numbers generated by cm/ecf.
[3] According to defendant, independent operators are allowed to negotiate prices directly with grocery store chains. (Barnes Decl., DE # 20, ¶ 12.) "[I]n reality[, however,] Chains will not generally negotiate with each individual [independent operator] directly related to the purchase of bakery products because doing so would be inefficient at best, and virtually impossible for a nationwide Chain since the number of [defendant's independent operators] in the United States number in the thousands." (Id.) Accordingly, defendant, as the independent operators' agent, negotiates the sale of its products to grocery store chains. (Id.)

2

to plaintiff, defendant refused to negotiate. (Compl., DE # 1-1, ¶ 15.)

Shortly after that meeting, just prior to Thanksgiving 2013, several items that plaintiff sold to Harris Teeter store #257 were out of stock. (See Hoffman Dep., DE # 35-2, at 7; Ramsey Dep., DE # 41-2, at 9.) The store manager, Paul Hoffman, and the assistant manager, Jason Falcone, decided they no longer wanted plaintiff to service the store. (Falcone Decl., DE # 36, ¶ 13; see also Hoffman Dep., DE # 35-2, at 6.) Falcone inquired of Jay Stanton, sales manager for defendant, (Ramsey Dep., DE # 41-2, at 10), "what steps [they] needed to take to have [plaintiff] ejected from Harris Teeter 257," (Falcone Decl., DE # 36, ¶ 13). Stanton told Falcone that "it was entirely [their] choice, but that if [they] wanted [plaintiff] gone [they] would have to ban him from the store . . . ." (Id.)

On 4 December 2013, Brant Vickers, defendant's Regional Sales Manager for the Raleigh Region, learned that plaintiff had been banned from the Harris Teeter store. (Vickers Decl., DE # 22, ¶ 19.) On 6 December 2013, Vickers delivered to plaintiff a "Notice of Breach of Distribution Agreement," stating:

> On December 4, 2013, your customer, Harris Teeter #257, reported to us that you are no longer permitted to service its store with the products of Bimbo Foods Bakeries Distribution Inc. ("BFBD") due to your continuing and continuous failure to provide proper and satisfactory service, including out of stock conditions on core items and promotional products. Accordingly, you are in breach of your Distribution Agreement with BFBD.
>
> You have three days to cure the contract violation. If you do not, we will take appropriate action under the Distribution Agreement.

(Id.; Compl., DE # 1-1, Ex. 5.)

Attempting to rectify the situation, plaintiff and another independent operator agreed to exchange stores or routes such that plaintiff would no longer be servicing the store. (Ramsey

3

Dep., DE # 35-1, at 22; Ramsey Dep., DE # 41-2, at 11.) Plaintiff discussed the proposed exchange with Vickers, who agreed to it. (Vickers Decl., DE # 22, ¶¶ 20-21; Ramsey Dep., DE # 41-2, at 11.) The other independent operator spoke with Falcone, the assistant store manager, about plaintiff and his changing stores or routes; however, Falcone would not agree to that arrangement. (Falcone Decl., DE # 36, ¶ 14.) On 11 December 2013, Vickers delivered a letter to plaintiff terminating the Distribution Agreement effectively immediately. (Vickers Decl., DE # 22, ¶ 22; Compl., DE # 1-1, Ex. 6.)

On 21 January 2014, plaintiff filed this action in state court, asserting claims for breach of contract, fraud, and unfair and deceptive trade practices under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA" or "UTPA"). Defendant then removed the case to this court.

Subsequently, defendant moved to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff filed a motion for preliminary injunction. On 10 July 2014, the court granted defendant's motion to dismiss plaintiff's fraud claim but denied the motion to dismiss his breach of contract and UDTPA claims. In addition, the court denied plaintiff's motion for preliminary injunctive relief.

## II. DISCUSSION

Defendant now seeks summary judgment on plaintiff's remaining claims. Summary judgment is appropriate provided that

> "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" "A fact is material if it 'might affect the outcome of the suit under the governing law.'"
> In considering a motion for summary judgment, the district court must "view the evidence 'in the light most favorable to the'"

4

nonmoving party. "Summary judgment cannot be granted merely
because the court believes that the movant will prevail if the action
is tried on the merits." The court therefore cannot weigh the
evidence or make credibility determinations.

Jacobs v. N.C. Admin. Office of the Courts. ___ F.3d ___, No. 2015 WL 1062673, at *4 (4th Cir. 2015) (citations and footnote omitted).

The court first considers plaintiff's breach of contract claim. Neither side disputes the validity of the subject contract, that is, the Distribution Agreement. Rather, their dispute centers on which party breached that agreement. Defendant contends that it properly terminated the Distribution Agreement as a result of plaintiff's failure to cure his breach of the Agreement. Specifically, defendant cites plaintiff's contractual obligations "'to buy and accept . . . sufficient quantities of the Products to adequately and properly supply the Outlets[, i.e., grocery stores,] in the Sales Area,'" (Def.'s Mem. Supp. Mot., DE # 35, at 3 (footnote omitted) (quoting Compl., Ex. 1, DE # 1-1, §3.2)), and "'to develop and maximize sales of Products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products to all Outlets . . . ,'" (id. (quoting Compl., Ex. 1, DE # 1-1, §4.1). Also, defendant points out that plaintiff agreed to "'provid[e] service on a basis consistent with good industry practice to all Outlets requesting service in the Sales Area.'" (Id. (alteration in original) (quoting Compl., Ex. 1, DE # 1-1, §4.1).)

Failure to fulfill these obligations "shall be considered a breach" and "entitle [defendant] to terminate [the Distribution] Agreement as more specifically set forth in Article 8 . . . ." (Compl., Ex. 1, DE # 1-1, §4.4.) The relevant portion of Article 8 provides:

>  §8.3 <u>CURABLE BREACH</u>: In the event of breach by
>  DISTRIBUTOR other than under §8.2,[i.e., a "non-curable"
>  breach,] [defendant]shall give DISTRIBUTOR three (3) business
>  days written notice within which DISTRIBUTOR may cure the
>  breach. If DISTRIBUTOR fails to cure such breach within said
>  three (3) day period, [defendant] may thereafter terminate this

5

> Agreement and DISTRIBUTOR shall have no further right to cure .
> . . .

(Id.) Defendant argues that plaintiff's ban from Harris Teeter store #257 rendered him unable to develop and maximize sales of products, or provide service, to all his stores, thereby putting him in breach. When plaintiff did not cure that breach, defendant maintains it properly terminated the Distribution Agreement.

Plaintiff does not dispute that he was banned from the store or that he was notified by defendant that the Distribution Agreement was being terminated based on his inability to continue to service Harris Teeter #257. What plaintiff disputes is the reason for that ban and the reason for the termination of the Agreement. Plaintiff blames the out-of-stock situation prior to Thanksgiving on defendant's ordering system and believes defendant enticed the store to ban him. Further, he theorizes, the real reason defendant terminated the Distribution Agreement is in retaliation for his membership on the committee speaking out against the change in margins.

Plaintiff points to a number of facts to support his position. To place orders for defendant's bakery products, plaintiff would order from his own computer at home through defendant's system. (Ramsey Dep., DE # 41-2, at 7.) That system suggested, by store, the amount to order, which plaintiff might increase or decrease based on his own judgment and whether certain products were on promotion at the time. (Id. at 7-8.) For the time period in question, the amount defendant's system suggested was low; plaintiff increased the amount ordered from that defendant suggested but obviously more should have been suggested and ordered to prevent the out-of-stock situation from occurring. (See id. at 8-9.)

Neither Harris Teeter store #257's nor defendant's management ever complained to plaintiff about out-of-stock product, other than on one occasion when assistant manager Falcone

6

told plaintiff a certain product was out of stock, and, in response, additional product was delivered to the store. (Ramsey Decl., DE # 41-1, ¶¶ 2, 4, 10.) In fact, a couple of weeks before the Thanksgiving 2013 incident, plaintiff and Joe Williams, a rack captain of defendant, were in the store together, and plaintiff asked Williams if "he had any issues out of the store and he said no." (Ramsey Dep., DE # 41-2, at 10; Williams Dep., DE # 35-4, at 3.) Similarly, Stanton, a sales manager for defendant, told plaintiff that he was doing a good job, (Ramsey Dep., DE # 41-2, at 10), and that "Harris Teeter Store #257 could not get a better operator than" him, (Ramsey Decl., DE # 41-1, ¶ 14).

Plaintiff admits knowing product at the store was at times low or out of stock. (Ramsey Dep., DE # 35-1, at 19, 20-21.) When that occurred, the procedure in place was for the store to call defendant or plaintiff directly, and the product would be promptly restocked. (Id. at 19; Ramsey Decl., DE # 41-1, ¶ 6; Ramsey Dep., DE # 41-2, at 9.) Defendant wanted the account handled in this manner so as to reduce the amount of returns for credit. (Ramsey Decl., DE # 41-1, ¶ 6.) With the out-of-stock situation which prompted plaintiff's ban, no one called plaintiff to notify him that additional product was needed at Harris Teeter store #257. (Ramsey Dep., DE # 41-2, at 9.)

It was one of defendant's managers who informed the store that plaintiff could be banned, (Falcone Decl., DE # 36, ¶ 13), apparently giving the impression that was the only option. Once plaintiff was banned, even though it was contrary to defendant's own interest in maximizing sales and even though defendant assisted other independent operators who had been banned from stores, defendant did nothing vis-à-vis the store to assist plaintiff in regaining entry. (See Ramsey Dep., DE # 41-2, at 11-12; Martin Aff., DE # 14-2, at 1.) No one informed the store manager, Hoffman, about the option of plaintiff and another independent operator exchanging stores. (Hoffman

7

Dep., DE # 41-3, at 3-4, 5-6.)

Plaintiff's termination occurred relatively shortly after the meeting at which plaintiff was very vocal in objecting to the decrease in margins. (See Ramsey Dep., DE # 41-2, at 6.) Around the same time, defendant terminated the Distribution Agreement of another independent operator who was also committee member. (Compl., DE # 1-1, ¶ 33 & Ex. 7.) Defendant has since sold plaintiff's distribution route, for what plaintiff contends was a grossly devalued price and for which he received only $6,947. Ramsey v. Bimbo Foods Bakeries Distrib., LLC, No. 5:15-CV-6-BR (E.D.N.C.) (Compl., DE # 5-1 , ¶ 20 & Exs. 3-6).

Not surprisingly, defendant vigorously disputes most of these facts and the inferences to be drawn therefrom. However, considering the totality of the facts in the light most favorable to plaintiff, the court cannot conclude that no reasonable juror could find that defendant breached the Distribution Agreement by improperly terminating it. Therefore, the entry of summary judgment on the breach of contract claim would not be proper.

Next, the court considers plaintiff's UDTPA claim. As the Fourth Circuit Court of Appeals has explained:

> The prohibition on unfair and deceptive trade practices in North Carolina is embodied in N.C. Gen. Stat. § 75–1.1(a), which provides, in pertinent part, that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." Therefore, for a plaintiff to prevail on an UTPA claim, he "must prove (1) that the defendant was engaged in conduct that was in or affecting commerce, (2) that the conduct was unfair or 'had the capacity or tendency to deceive,' and (3) 'that the plaintiff suffered actual injury as a proximate result of' " the defendant's actions. In our *Gilbane* decision in 1996, Judge Ervin had occasion to interpret and apply the North Carolina UTPA, and he there observed that "[w]hat constitutes an unfair or deceptive trade practice is a somewhat nebulous

8

concept," and that "North Carolina courts base their determinations [of whether a particular practice is unfair or deceptive] on the circumstances of each case." Thus, whether a particular practice violates the UTPA is both a question of law and a highly fact-specific inquiry.

As Judge Ervin noted in *Gilbane*, in assessing whether particular conduct violates the UTPA, "[e]ither unfairness or deception can bring conduct within the purview of the statute; an act need not be both unfair and deceptive." And while there is no doubt that the North Carolina courts have construed the UTPA liberally, there are some limits on its application. For example, only practices that involve "[s]ome type of egregious or aggravating circumstances" are sufficient to violate the UTPA.

As a general rule, a practice is considered "unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." The North Carolina Court of Appeals explained the applicable standard several years ago . . ., observing that an "unfair practice" under the UTPA is conduct

> *which a court of equity would consider unfair*. Thus viewed, the fairness or unfairness of particular conduct is not an abstraction to be derived by logic. Rather, the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others.

Significantly, the Supreme Court of North Carolina has held that "where a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice." A particular practice is to be deemed deceptive, and in violation of the UTPA, if it has "the capacity or tendency to deceive." Thus, only the potential for deception is necessary; "proof of actual deception is not required."

It is clear, however, that conduct carried out pursuant to contractual relations rarely violates the UTPA. In fact, even an intentional breach of contract is normally insufficient to contravene the UTPA; a breach of contract must be particularly egregious to permit recovery under North Carolina's UTPA.

S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 535-36 (4th Cir. 2002) (citations omitted)

9

(most alterations in original).

Defendant urges the court to grant judgment in its favor on this claim because plaintiff's UDTPA claim is based wholly on his breach of contract claim and because plaintiff cannot show the existence of substantial aggravating circumstances. However, based on the facts highlighted previously with regard to plaintiff's breach of contract claim, the court concludes that genuine issues of material fact exist as to whether defendant's termination of the Distribution Agreement was pretext for retaliating against plaintiff for his membership on the committee speaking out against the change in margins. Thus, the court will deny defendant's motion to the extent it seeks judgment on plaintiff's UDTPA claim.

### III.  CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED.

This 24 March 2015.

                                             _____
                                             W. Earl Britt
                                             Senior U.S. District Judge

10

Case 5:14-cv-00026-BR   Document 44   Filed 03/24/15   Page 10 of 10